UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) ) | Criminal Action No. 5: 15-104-DCR |
| V. | ) ) | |
| LONNIE W. HUBBARD, | ) ) | **MEMORANDUM OPINION AND ORDER** |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Defendant Lonnie Hubbard has moved the Court for a new trial, arguing that: (i) his convictions were not supported by sufficient evidence[1] and (ii) the Court improperly admitted other act evidence in violation of Fed. R. Evid. 404(b). [Record No. 371] The government disagrees, contending that Hubbard's conviction was not against the manifest weight of the evidence and that the "other act" evidence cited by Hubbard is intrinsic to the charges and is not subject to Rule 404(b). [Record No. 372] Hubbard's motion will be denied for the reasons that follow.

**I.**

Hubbard was a licensed Kentucky pharmacist who owned RX Discount Pharmacy in Berea, Kentucky. He was the active pharmacist at this business and also employed relief pharmacists to assist him from time-to-time. Law enforcement began investigating Hubbard

---

[1] As will be discussed, Hubbard incorrectly makes his argument by reference to the sufficiency of the evidence. Sufficiency of the evidence is the standard that is applicable to motions for acquittal under Fed. R. Crim. P. 29. The standard applicable to a motion for a new trial is whether the conviction is against the manifest weight of the evidence.

-1-

after one of the relief pharmacists reported Hubbard's practices regrading filling out-of-state oxycodone prescriptions.

The United States indicted Hubbard and several others in December 2015. Hubbard was charged with a total of 73 counts, including charges of conspiring to illegally distribute pseudoephedrine and oxycodone; illegally distributing pseudoephedrine; illegally distributing hydrocodone; illegally distributing oxycodone; opening and maintaining a business for the purpose of illegally distributing controlled substances and pseudoephedrine; conspiring to commit money laundering; and money laundering. The Court conducted a trial, and the jury ultimately convicted Hubbard of all of the charges presented to it.[2]

## II.

Under Federal Rule of Criminal Procedure 33, a court "may vacate any judgment and grant a new trial if the interest of justice so requires." The rule itself does not define the "interest of justice" or identify the circumstances under which a new trial is appropriate. *United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010). However, courts have determined that a defendant is entitled to a new trial where, as relevant here, the "jury's verdict was against the manifest weight of the evidence" or the district court committed a substantial legal error. *Id*. (internal quotation marks and citations omitted). Neither showing has been made entitling Hubbard to relief in the present case.

### A. Manifest Weight of the Evidence

Sustaining a motion for a new trial based on a claim that the verdict is against the manifest weight of the evidence is appropriate "only in the extraordinary circumstance where

---

[2] The government dismissed some of the counts in the indictment before the case was submitted to the jury.

the evidence preponderates heavily against the verdict." *United States v. Hughes*, 505 F.3d 578, 592-93 (internal quotation marks and citation omitted). A district court is permitted to assess the credibility of witnesses and weigh the evidence in making this determination. *United States v. Lutz*, 154 F.3d 581, 589 (6th Cir. 1998).[3]

### *i. Conspiracy Charge*

The indictment charges Hubbard with conspiring to distribute pseudoephedrine and oxycodone in violation of 21 U.S.C. §§ 841 and 846. [Record No. 295] This required the government to prove that Hubbard conspired with others to distribute oxycodone outside the scope of his professional practice and without a legitimate medical purpose and to distribute pseudoephedrine while knowing, intending, or having reasonable cause to believe that it would be used to manufacture a controlled substance. 21 U.S.C. §§ 841, 846. The jury was instructed that, to find Hubbard guilty of this charge, they must find that the government proved: (1) an agreement to violate the drug laws; and (2) that Hubbard knowingly and voluntarily joined the conspiracy.

For the agreement element, the government must prove that the participants in the conspiracy came to some form of mutual understanding regarding the illegal activity. *United States v. Pearce*, 912 F.2d 159, 161 (6th Cir. 1990). It is not necessary that the government prove a formal agreement. *United States v. Hughes*, 891 F.2d 597, 601 (6th Cir. 1989) Instead,

---

[3] Hubbard often refers to the "sufficiency" of the evidence in his motion for a new trial. However, the sufficiency of the evidence is the standard of review applicable to a motion for an acquittal under Rule 29. *United States v. Hughes*, 505 F.3d 578, 592 (6th Cir. 2007). In contrast, the standard that applies for a motion for a new trial under Rule 33 is whether the jury's verdict is against the manifest weight of the evidence. *Id.* Because Hubbard filed a motion for a new trial, that is the standard under which the Court will evaluate his motion. In any event, for the reasons discussed below, there is also sufficient evidence upon which a reasonable trier of fact could have relied to convict Hubbard of the crimes charged.

a conspiracy can be "inferred from acts done with a common purpose" and it is sufficient for the evidence to establish some tacit or implicit understanding. *Id*. "The existence of a conspiracy may be inferred from circumstantial evidence that can reasonably be interpreted as participation in the common plan." *United States v. Martinez*, 430 F.3d 317, 330 (6th Cir. 2005) (internal quotation marks omitted). Although sales alone do not establish the agreement necessary for proof of a conspiracy, "evidence of repeat purchases from a single source and large volumes of narcotics creates an inference of conspiracy." *United States v. MacLloyd*, 526 Fed. Appx. 434, 439 (6th Cir. 2013) (citations omitted). A pharmacist may conspire to distribute controlled substances illegally "by filling prescriptions of oxycodone for the benefit of numerous drug dealers and fake patients" while knowing or having reason to know that the individuals are obtaining the drugs for illicit use. *United States v. Green*, 818 F.3d 1258, 1275 (11th Cir. 2016).

The jury's verdict convicting Hubbard of conspiring to distribute oxycodone in violation of 21 U.S.C. §§ 841 and 846 is not against the manifest weight of the evidence. First, the government introduced evidence of the existence of an agreement to illegally distribute oxycodone outside the scope of professional practice and not for a legitimate medical purpose. Individuals from Kentucky testified that they would travel to other states to obtain prescriptions for pain medication. These individuals confirmed that they did not have a medical need for the pain medication but, instead, were addicts who were required to travel out-of-state to obtain prescriptions because they were unable to obtain them from doctors in Kentucky. They further reported that they would use the oxycodone or sell it on the street.

There was also ample evidence showing that Hubbard knowingly agreed to distribute oxycodone outside the scope of professional practice and not for a legitimate medical purpose,

-4-

and that he voluntarily joined the conspiracy by filling these prescriptions. Many government witnesses testified to the numerous "red flags"[4] suggesting that Hubbard's customers were purchasing oxycodone for illicit purposes. First, the fact that so many customers were bringing prescriptions for pain medication from other states was an indication that these prescriptions were illegitimate. Hubbard would require cash payments to fill out-of-state oxycodone prescriptions at inflated prices. There was also evidence that customers would request pills of a certain color, which is indicative of diversion. Simply put, some colors are more valuable than others when being sold on the street.

The evidence of Hubbard's conduct in filling prescriptions also proved that he was aware that the products were intended for illegitimate uses. Witnesses testified that Hubbard told customers not to arrive early or wait outside the pharmacy because he did not want a line in front of his business. There was also evidence that Hubbard attempted to manipulate data regarding the sale of controlled substances by limiting the number of out-of-state prescriptions that he would fill each day, and that he required customers to obtain unnecessary non-controlled medications. Additionally, the government introduced video evidence in which a customer told Hubbard that he was having trouble obtaining prescriptions for controlled substances. Hubbard then provided him with information for an out-of-state pain clinic, stating that this clinic was the only place he knew that was "selling any."

---

[4] As explained at trial, the DEA has identified numerous red flags, which indicate that a pharmacist's practices in selling controlled substances and/or listed chemicals may violate the drug laws.

Based on the evidence presented during trial, the jury's verdict convicting Hubbard of conspiring to distribute oxycodone outside the scope of professional practice and not for a legitimate medical purpose was not against the manifest weight of the evidence.

Likewise, the jury's verdict convicting Hubbard of conspiring to distribute pseudoephedrine while knowing, intending, or having reasonable cause to believe that it would be used to manufacture a controlled substance was not against the manifest weight of the evidence. The government introduced evidence establishing an agreement to distribute pseudoephedrine illegally. Multiple witnesses testified that they would purchase products containing pseudoephedrine from Hubbard's pharmacy. They would then sell it to others who they knew would use it to manufacture methamphetamine or manufacture methamphetamine themselves. There was also proof that Hubbard would sell pseudoephedrine products to customers who had travelled long distances to purchase it from his pharmacy because the pharmacy had a reputation for being an easy place to purchase the product. This evidence demonstrated an implicit agreement to distribute pseudoephedrine while knowing or having reasonable cause to believe that it would be used to manufacture methamphetamine in violation of the drug laws.

The evidence also showed that Hubbard knowingly violated the drug laws. Hubbard sold pseudoephedrine products at inflated prices, which is indicative of knowledge that the customers were purchasing the product to manufacture methamphetamine and not for the medicinal purpose for which it is intended. Additionally, Hubbard informed a law enforcement agent that he would sell pseudoephedrine to anyone with "a pulse and an ID," indicating that he adopted a lax approach to sales that facilitated the purchase of pseudoephedrine products for the purpose of manufacturing methamphetamine. The jury's conviction for conspiracy to

distribute pseudoephedrine in violation of the drug laws was not against the manifest weight of the evidence.

### ii. Pseudoephedrine Charges

Hubbard was convicted of several counts of distributing pseudoephedrine while knowing, intending, or having reasonable cause to believe that it would be used to manufactured a controlled substance in violation of 21 U.S.C. § 841.[5] [Record No. 295] Hubbard argues that his pseudoephedrine convictions cannot stand because all of his pseudoephedrine sales complied with the requirements imposed by NPLEx.[6] This argument is without merit.

The evidence at trial established that Hubbard sold pseudoephedrine products that were used to manufacture methamphetamine. As previously discussed, witnesses testified that they used the pseudoephedrine that Hubbard sold them to manufacture methamphetamine, or sold it to others who used it for that purpose. Additionally, law enforcement officers testified that they investigated methamphetamine labs involving individuals who had purchased the methamphetamine precursor from Hubbard's pharmacy.

The trial evidence also established that Hubbard knew or had reason to know that he was selling pseudoephedrine products to individuals who were using it to manufacture

---

[5] Some of the counts of the indictment charged the illegal distribution of pseudoephedrine while aided and abetted by others in violation of 18 U.S.C. § 2. Because of the generalized nature of Hubbard's argument, this distinction is not relevant for purposes of this analysis.

[6] NPLEx is a system that pharmacists use to assist them in selling pseudoephedrine products. The system imposes limits on the quantity of pseudoephedrine that an individual customer is permitted to purchase in a day or a month. Pharmacists enter a customer's information into the system and the system indicates whether the customer is permitted to purchase the pseudoephedrine.

methamphetamine. The data introduced at trial established that Hubbard sold extremely large quantities of pseudoephedrine through his small, independent pharmacy. Hubbard's drug suppliers warned him that his sales of this drug were excessive when they ended their business relationship with him. *See United States v. Warhurst*, 132 Fed. Appx. 795 (11th Cir. 2005) (concluding that the defendant had knowledge that he was selling pseudoephedrine illegally based in part on a "call from the compliance coordinator [that] indicate[d] that [the defendant] knew [his] mass sales were a problem").

Hubbard's sales practices also indicate that he knew that his customers were using pseudoephedrine products to manufacture methamphetamine or were selling it to others who were doing so. Witnesses testified that Hubbard charged an inflated price for pseudoephedrine products. The fact that Hubbard knew that his customers were willing to pay increased prices supports the inference that he knew that they were purchasing the pseudoephedrine products for the purpose of making methamphetamine. Witnesses also testified that Hubbard had told them that he would sell pseudoephedrine to anyone with a "pulse and an ID," suggesting that he was intentionally selling large volumes of pseudoephedrine products without regard for the purpose for which the customers were purchasing it. Likewise, it is a fair and reasonable inference that Hubbard either knew or should have known that individuals were traveling long distances to purchase pseudoephedrine from his pharmacy because they were using the product to manufacture methamphetamine rather than for legitimate medical purposes.

The government presented more than adequate evidence to establish that Hubbard was selling pseudoephedrine products while knowing that the products were being used to manufacture methamphetamine. Hubbard's argument based on his compliance with the limitations imposed by NPLEx does not alter this conclusion. Hubbard had the ultimate

responsibility for determining whether a particular pseudoephedrine sale was appropriate, regardless of the NPLEx limits. Simply put, if he had reason to know that a person would use the product to manufacture methamphetamine, the sale was illegal. This is true regardless of whether the specific quantities that he sold complied with the limitations imposed by NPLEx. NPLEx is designed to assist pharmacists, but it is not intended to be dispositive. Here, the evidence establishes that Hubbard sold pseudoephedrine products while knowing or having reason to know that the products were being purchased to manufacture methamphetamine. His conduct violated § 841, and it is irrelevant that he complied with NPLEx limits. Accordingly, the jury's verdict on these counts was not against the manifest weight of the evidence.

### iii. Hydrocodone Charge

The indictment also charged Hubbard with one count of distributing hydrocodone outside the scope of professional practice and not for a legitimate medical purpose in violation of 21 U.S.C. § 841(a)(1). [Record No. 295] Hubbard argues that his conviction on this count is against the manifest weight of the evidence because the customer had a legitimate medical need for the medication. However, the evidence introduced at trial established facts to the contrary and the conviction on this charge was not against the manifest weight of the evidence.

The government introduced evidence establishing that Hubbard filled a hydrocodone prescription for a customer who stated that she was being weaned off the medication. However, Hubbard filled two prescriptions within a seven-day period, resulting in the customer receiving all of the drug in a short amount of time—directly contravening the physician's instructions regarding weaning. Additionally, the evidence demonstrated that Hubbard filled the prescription while knowing that it was not for a legitimate medical need. Hubbard required cash as payment for the prescription, despite the customer having insurance

coverage. *See Green*, 818 F.3d at 1276 (concluding that the defendants had knowledge that many of the pharmacy's customers were drug dealers or using drugs illicitly in part because the customers usually paid in cash, a "tell-tale sign[] of drug abuse").

### iv. Oxycodone Charges

The indictment also charges Hubbard with several counts of distributing oxycodone outside the scope of professional practice and not for a legitimate medical purpose in violation of 21 U.S.C. § 841(a)(1).[7] Hubbard argues that the convictions on these counts are against the manifest weight of the evidence because the customers testified that they had a legitimate medical need for the oxycodone and their medical need was verified by MRIs that Hubbard required that they provide. However, the government introduced overwhelming evidence establishing that Hubbard distributed oxycodone illegally. His conviction on these counts was not against the manifest weight of the evidence.

The evidence relating to the circumstances surrounding the prescriptions showed that that they were not for a legitimate medical need. Many of Hubbard's customers were Kentucky residents who traveled long distances to other states to obtain oxycodone prescriptions and then bring them back to Hubbard's pharmacy to be filled. *See Green*, 818 F.3d at 1276 (noting that prescriptions put the defendants on "clear notice" that they were for illicit use because the customers "were traveling long distances from the prescribing physician to fill prescriptions"). The physicians prescribing the oxycodone did not specialize in pain management—one physician was a gynecologist and another was a pediatrician. *See, e.g.*, *United States v. Darji*, 609 Fed. Appx. 320, 339 (6th Cir. 2015) (concluding that the pharmacist had illegally

---

[7] Some of the oxycodone counts charged Hubbard with distribution, aided and abetted by others. This distinction is not relevant for purposes of addressing Hubbard's argument.

distributed controlled substances in part because a prescribing physician was a psychiatrist, who would not normally prescribe hydrocodone). Additionally, many of the physicians were under investigation by the DEA as a result of their controlled substance distribution practices. *See id.*

Government witnesses testified that several aspects of the customer interactions indicated that they were obtaining oxycodone for illicit use. The prescriptions were for 15mg and 30mg doses which is some indication of illicit drug use rather than for legitimate medical need. Similarly, customers would request specific colors when having their prescriptions filled, which suggests that the pills were being diverted. Certain colors have greater street value. For these reasons, several pharmacists testified that they would not be comfortable filling the out-of-state prescriptions that Hubbard regularly filled. *See United States v. DeBoer*, 966 F.2d 1066, 1069 (6th Cir. 1992) (discussing evidence supporting the defendant pharmacist's conviction, including that other pharmacists testified that they would not honor the prescriptions that the pharmacist filled).

Hubbard also told his customers not to wait in line before his pharmacy opened. This is additional evidence that Hubbard was aware that this activity would call attention to his pharmacy's practices. *See Green*, 818 F.3d at 1276 (stating that the "long lines of customers" indicated that the customers were abusing their prescriptions rather than obtaining the drugs for a legitimate purpose). And Hubbard would charge customers inflated fees to fill out-of-state prescriptions and would require that they pay in cash, regardless of whether they had insurance. *See Darji*, 609 Fed. Appx. at 339 (upholding the defendant pharmacist's conviction for illegally distributing controlled substances and noting that he charged highly inflated fees and did not accept insurance). On occasion, he would bill their insurance as well.

The volume of Hubbard's oxycodone sales is also some evidence that he was distributing products outside of professional practice. Several witnesses testified that Hubbard's oxycodone sales numbers were staggering for an independent pharmacy in the Berea, Kentucky area. *See DeBoer*, 966 F.2d at 1069 (discussing the pharmacist defendant's abnormally large amounts of controlled substance sales, which indicated that he was selling the drug illegally). Additionally, the evidence indicated that several drug suppliers terminated their business relationship with Hubbard because they were concerned with the high volume of sales of controlled substances. Many suppliers shared these concerns with Hubbard while ending their business relationship with him. *See id.* (opining that a letter from a supplier refusing to continue selling controlled substances to the defendant "because of excessive orders which placed the supplier at risk for violation DEA regulations" supported an inference that the defendant was knowingly selling controlled substances illegally).

The government also introduced evidence that Hubbard sought to manipulate his controlled substance sales numbers. Specifically, he would limit the number of out-of-state oxycodone prescriptions per day and require customers to obtain non-controlled substance medication that they did not need. This evidence demonstrates that Hubbard was knowingly distributing oxycodone outside the scope of professional practice. *See Darji*, 609 Fed. Appx. at 336 (discussing the pharmacist defendant's practice of intentionally manipulating his controlled substance orders and shifting prescriptions among his three pharmacies to "avoid DEA scrutiny regarding the amount of hydrocodone coming from his pharmacies").

The evidence further demonstrates that many of Hubbard's customers did not have a legitimate medical need for oxycodone. These customers testified that they obtained oxycodone based on their addictions, and not because they had medical conditions requiring

it. They did not have a medical need for the medication and they were required to travel out of state to obtain prescriptions because Kentucky doctors would not write them. The customers further stated that they would obtain their prescriptions from pain clinics where they would not be treated by a physician to determine whether they had a legitimate medical need for the medication. They would, at most, undergo a cursory physical before being provided with a prescription.

Contrary to Hubbard's contention, the MRIs required of his customers did not establish a legitimate medical need for the pain medication. Instead, this was attempted cover for Hubbard. Several government witnesses testified that pharmacists are responsible for verifying that a prescription is legitimate before filling it. Pharmacists often comply with this responsibility by developing a relationship with the patient, familiarizing themselves with the patient's condition, and, if necessary, calling the prescribing physician to confirm the circumstances of the prescription. Requiring an MRI would not accomplish the goal of verifying the prescription's validity, because pharmacists are not qualified to evaluate MRIs. Rather than establish a legitimate medical need, the evidence indicated that the MRIs were designed to provide documentation suggesting that illegitimate prescriptions were in fact based on a legitimate medical need.

The jury's verdict on these counts was not against the manifest weight of the evidence.

*v. Remaining Charges*

The indictment also charged Hubbard with several counts of money laundering in violation of 18 U.S.C. §§ 1956(h) and 1957, and with maintaining his pharmacy for the purpose of illegally distributing oxycodone and pseudoephedrine in violation of 21 U.S.C. § 856(a)(1). Hubbard does not raise any additional challenges to these charges in his motion, and did not do so at trial. However, each of these offenses requires proof that Hubbard distributed drugs illegally. Hubbard presumably argues that, because the government has not established that he distributed drugs illegally, the remaining convictions are against the manifest weight of the evidence. However, based on the evidence discussed previously, the government established that Hubbard illegally distributed oxycodone and pseudoephedrine. Accordingly, it established that element of each of these charges. Hubbard has failed to demonstrate that his convictions on these charges were against the manifest weight of the evidence.

**B.     Substantial Legal Error**

Federal Rule of Criminal Procedure 33 permits a court to "vacate any judgment and grant a new trial if the interest of justice so requires." A court may grant a new trial "where substantial legal error has occurred." *United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010). Courts have not clearly defined the level of "substantial error" that would warrant a new trial, but the Sixth Circuit has stated that a new trial is available where "the substantial rights of the defendant have been jeopardized by errors or omissions during trial . . . ." *Id.* (quoting *United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989)).

Hubbard argues that a new trial is appropriate because the Court committed a substantial legal error by admitting evidence over his objection.⁸ He identifies evidence that he alleges constitutes "other acts" evidence admitted in violation of Federal Rule of Evidence 404(b). Specifically, Hubbard argues that the Court erred in admitting: evidence that he sold SudoGest; a photograph of large sums of cash found in Hubbard's vehicle that was taken during a traffic stop; evidence that Hubbard failed to maintain his certification to sell pseudoephedrine; evidence of "misfills" and/or forgery relating to certain prescriptions; testimony that Hubbard loaned/fronted pills; and evidence that Hubbard improperly billed insurance.

As an initial matter, even assuming error in admitting the evidence that Hubbard cites, such error would not warrant a new trial. The government presented substantial evidence to establish Hubbard's guilt. There was no shortage of proof from which the jury was able to conclude that Hubbard was guilty of the crimes charged. Given the overwhelming proof demonstrating Hubbard's guilt, the evidence that he identifies is minor. Moreover, Hubbard has not indicated that the admission of the evidence was so prejudicial as to amount to "jeopardiz[ing]" any substantial rights. Accordingly, he has not demonstrated that the admission of the evidence amounted to an injustice that would warrant a new trial.

Notwithstanding the foregoing, there was no error in admitting the evidence under Rule 404(b). Rule 404(b) provides that, "[e]vidence of a crime, wrong, or other act is not

---

⁸ Hubbard also makes a brief argument that a new trial is appropriate because "essential elements were not proven in the trial," which raises the same challenge as his argument relating to the adequacy of the evidence supporting his convictions. For the reasons outlined in the prior section, the government introduced evidence establishing all elements of the crimes charged. This argument lacks merit.

admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). However, Rule 404(b) only applies to evidence that is "extrinsic" to the crime charged, which is evidence for which there "is a lack of temporal proximity, causal relationship, or special connections between the other acts and the charged offense." *United States v. Chalmers*, 554 Fed. Appx. 440, 450 (6th Cir. 2014). In contrast, the rule does not apply to "background" evidence or evidence that is "intrinsic" to the offense(s) charged. *Id*.

Courts have explained that the "contours of what constitutes 'intrinsic' evidence are not exactly clear . . . ." *United States v. Adams*, 722 F.3d 788, 822 (6th Cir. 2013). However, "intrinsic evidence requires a connection to the charged offense." *Id*. It includes that which is "part of a single criminal episode. Rule 404(b) is not implicated when the other crimes or wrongs evidence is part of a continuing pattern of illegal activity." *United States v. Barnes*, 49 F.3d 1144, 1149 (6th Cir. 1995). The Sixth Circuit has indicated that whether evidence is intrinsic depends on whether there is "temporal proximity, causal relationship, or spatial connections between the other acts and the charged offense." *Chalmers*, 554 Fed. Appx. at 450, 451.

Here, the evidence in issue was intrinsic because of the close temporal, spatial, and causal link between it and the offenses charged. The evidence in question was not subject to Rule 404(b) and the Court did not err by admitting it. Hubbard's argument regarding this evidence fails.

During the period charged, Hubbard sold over 1,000 100-count bottles of SudoGest, despite the bottles' being labeled "not for retail sale." A witness testified that he purchased a bottle of the product from Hubbard and used it to manufacture methamphetamine. The

indictment charged Hubbard with conspiracy to distribute pseudoephedrine while knowing, intending, or having reasonable cause to believe that it would be used to manufacture methamphetamine. Evidence that Hubbard distributed bottles of pseudoephedrine that were not for retail use and to individuals who used them to manufacture methamphetamine is direct evidence of Hubbard's guilt regarding the conspiracy charge. Accordingly, it is intrinsic evidence that is not subject to Rule 404(b).

The government also presented photographs of a bank bag of currency taken during an unrelated traffic stop. This evidence is intrinsic to the hydrocodone and oxycodone charges because, as previously discussed, the fact that Hubbard required his customers to pay cash for prescriptions indicated that he was knowingly distributing the pills outside of the scope of professional practice and not for a legitimate medical purpose. The photographs of cash were evidence of the large amounts of cash that Hubbard was collecting at his pharmacy and thus were intrinsic evidence that went directly to proving that Hubbard was filling a large number of illegitimate oxycodone prescriptions. These photographs also were intrinsic evidence regarding the money laundering charges.

There was a temporal, spatial, and causal proximity between the evidence relating to Hubbard's failure to maintain his certification to sell pseudoephedrine and the offenses charged. The government introduced evidence that Hubbard failed to maintain his certification during the time charged in the conspiracy count. The certification evidence was temporally related to this charge. It was also spatially and causally related because it dealt with the manner in which Hubbard conducted business in his pharmacy, which is where he sold all of the pseudoephedrine on which the offenses charged were based.

The government also introduced evidence that Hubbard forged and filled a prescription by signing an oxycodone prescription that the prescribing doctor had neglected to sign and also increasing its strength. Forging a doctor's signature and altering a prescription is outside the scope of professional practice for a pharmacist. Accordingly, this evidence was direct proof of the crime charged and was intrinsic evidence of that offense.

Evidence that Hubbard was loaning and fronting pills was also directly related to the crimes charged. The government presented evidence that Hubbard would provide customers with partial fills of their oxycodone prescriptions before the date for filling that the prescription itself provided. Pharmacist witnesses testified that they would not engage in this practice because they are not permitted to fill prescriptions prior to the date that they are set to be filled. This evidence demonstrated that Hubbard was distributing oxycodone outside the scope of professional practice, as charged in the indictment.

Finally, evidence that Hubbard improperly billed Medicare and Medicaid for various prescriptions was intrinsic to the crimes charged. When filling out-of-state oxycodone prescriptions, Hubbard would charge inflated cash prices and also bill the customer's insurance. Requiring cash payments was direct evidence that Hubbard was knowingly distributing oxycodone outside the scope of professional practice and not for a legitimate medical purpose. Additionally, the conduct was temporally related to crimes charged because it occurred contemporaneously with the offenses. It was also spatially and causally related because it occurred in the same pharmacy from which Hubbard was illegally distributing controlled substances and also dealt with the manner in which he was distributing those substances.

For these reasons, the evidence that Hubbard identifies in his motion for a new trial was intrinsic to the offenses charged. Accordingly, Rule 404(b) does not apply and Hubbard's argument that the evidence was admitted improperly fails.

**III.**

For the foregoing reasons, it is hereby

**ORDERED** that Hubbard's motion for a new trial [Record No. 371] is **DENIED**.

This 26th day of April, 2017.

Signed By:
*Danny C. Reeves* DCR
United States District Judge